IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

YVES AUBERT,

                      Petitioner,

  v.                                              OPINION and ORDER

LAURIE LEE POAST,                              24-cv-926-jdp

                      Respondent.

---

Petitioner Yves Aubert petitions under the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act (ICARA) for the return of his two minor children to Norway. The children, whom the court will refer to as LPA and APA, are eleven and six years old respectively. The children's mother, respondent Laurie Lee Poast, brought them from Norway to Wisconsin in May 2024 for a family visit and now refuses to return them to Norway.

Two motions are before the court. First, Poast moves to dismiss the complaint, contending that Aubert lacks custody of the younger child, APA, and thus cannot seek her return through a Hague petition. Second, Aubert moves for supervised visitation with the children during the pendency of these proceedings. The motion to dismiss will be denied because Poast has not established that Aubert lacks custody rights over APA. The motion for supervised visitation will be granted because the court concludes that visitation is in the children's best interest.

ANALYSIS

A. Poast's motion to dismiss

Poast contends that Aubert cannot seek APA's return under the Hague Convention because he lacks custody rights over APA. Although Poast's arguments apply only to APA, Poast moves to dismiss the petition in its entirety on the basis that LPA and APA should not be separated. The court will deny Poast's motion to dismiss the petition for APA, so it need not consider the issue of separating the children.

Poast moves to dismiss for both lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). But Poast's challenge to Aubert's custody rights does not raise jurisdictional issues. A federal court's subject matter jurisdiction is limited by Article III and any other applicable statutory requirements. *Tereshchenko v. Karimi*, 102 F.4th 111 (2d Cir. 2024). Aubert has Article III standing: Poast's removal of his children from Norway is a concrete and redressable injury. *See Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992)). The court also has statutory authority to hear this case: ICARA confers on federal district courts original jurisdiction of all actions arising under the Hague Convention. 22 U.S.C. § 9003(a). Poast's contention that Aubert lacks custody rights is a challenge to the merits of Aubert's petition, not to jurisdiction. *See Tereschchenko*, 102 F.4th at 126 (concluding that the issue whether father consented to children's removal was not jurisdictional). The court will analyze the motion under Rule 12(b)(6), not Rule 12(b)(1). Under Rule 12(b)(6), the question is whether, drawing all reasonable inferences in favor of the petitioner, the petition states a plausible claim for relief

under the Hague Convention. *See Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997).

Poast's motion concerns the custody element of a Hague Convention petition. To establish a prima facie case for return, the petitioner must show "wrongful removal" of a child, meaning removal in breach of a right of custody held by the petitioner in the country of habitual residence. Hague Convention Art. III(a). The Convention defines "rights of custody" to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Id.* Art. V(a). Rights of custody are distinct from rights of access, which do not allow a parent to petition for a child's return. *Abbott v. Abbott*, 560 U.S. 1, 9 (2010). Visitation is a right of access, so a parent with only visitation rights may not petition for a child's return. *Id.*

The parties agree that the relevant law for determining Aubert's parental rights is Norway's Children Act. *Act Relating to Children and Parents (Children Act), available at* https://www.regjeringen.no/en/dokumenter/the-children-act/id448389/. Under the Children Act, parents may have sole or joint "parental responsibility," which gives them the right to make decisions for the child. *Id.* § 33. A parent who lacks parental responsibility may still have access rights under the Children Act. *Id.* §§ 42–46. Parents with access rights also have rights to be informed, to express an opinion, and to request mediation on issues that affect their access rights, including the child's relocation. *Id.*

Aubert admits in the petition that he does not have parental responsibility for APA. Dkt. 1, ¶ 6. Aubert did have visitation rights with APA at the time of her removal. The parties were involved in an active custody case when the children were removed; as part of that case, they had reached a temporary agreement allowing Aubert to visit the children. *Id.* ¶¶ 52–53.

3

Poast contends that Aubert's petition fails as a matter of law because Aubert's parental rights to APA were limited to visitation, which is an access right and not a right of custody. Poast argues that section 40 of the Children Act is dispositive. The first paragraph of section 40 says that "[i]f one of the parents has sole parental responsibility, the other parent may not object to the child relocating abroad."

In response, Aubert contends that the Children Act gives him a *ne exeat* right to APA even though he lacks parental responsibility over her. A *ne exeat* right— the right to prevent the child's removal abroad—is a custody right under the Convention. *Abbott*, 560 U.S. at 11. Aubert identifies four sections of the Children Act as the source of his *ne exeat* right:

- Section 40, ¶ 3: "If the parents disagree as to who shall have parental responsibility, or on international relocation or custody, the child must not relocate abroad until the matter has been decided."

- Section 42a: "If one of the parents intends to relocate within Norway or abroad, and access has been determined by agreement or decision, the parent who intends to move shall notify the other parent no later than three months prior to relocation. If the parents disagree regarding relocation, the parent who intends to relocate with the child must request mediation pursuant to section 51." Dkt. 1-1, at 13.

- Section 46: "Any person who has right of access to the child shall, as far as possible, be allowed to express an opinion before the parent who has parental responsibility takes decisions that will make it impossible or considerably more difficult to exercise right of access to the child."

- Section 51, ¶ 4: "Parents who disagree regarding the child's relocation must attend mediation."

Aubert argues that the temporary agreement giving him visitation rights to APA gave him "access . . . determined by agreement or decision," meaning that Poast was required to inform him of APA's impending relocation and give him a chance to mediate. He says that Poast failed to comply with the notification requirement, which prevented him from exercising his right to mediate under section 42a and to express an opinion on the relocation under section 46.

4

In her reply brief, Poast argues that Aubert had no right to notification under section 42a because the parties' visitation agreement was temporary: the agreement prescribed only three visits between February and May 2024, with additional visitation to be determined at the next court proceeding on May 31, 2024. But Poast's argument is contradicted by the plain language of section 42a, which states that a party with "access . . . determined by agreement or decision" has a right to notification before the child is relocated. Poast cites no authority to support her argument that a temporary agreement is not an "agreement" under section 42a.

But that doesn't resolve the issue. The key question is whether the Children Act, which gives Aubert the right to be notified, to request mediation, and to "express an opinion" before APA is relocated, but which also states that Aubert may not "object" to APA's relocation abroad, gives Aubert a *ne exeat* right to prevent APA's removal from Norway. Whether the Children Act gives Aubert a *ne exeat* right is a question requiring interpretation of foreign law. The court resolves issues of foreign law in a Hague Convention case like any other question of law, but the court may consider "any relevant material or source, including testimony" in resolving the issue. *Garcia v. Pinelo*, 808 F.3d 1158, 1163 (7th Cir. 2015) (quoting Federal Rule of Civil Procedure 44.1).

Neither side has adequately briefed the key question in this case. Both Aubert and Poast have simply pointed to the sections of the Children Act that benefit them, without explaining how those sections interact with each other or what rights they confer on Aubert to prevent APA's removal. Because neither side fully addressed the relevant issue in their briefs, the court declines to rule now on Aubert's custody rights. The court will deny the motion to dismiss. In their pretrial submissions, the parties should explain more fully whether the Children Act does or does not allow Aubert to prevent APA's removal from the country, in light of all the relevant

5

sections identified above. In addition to their affidavits of foreign law, the parties should cite case law or other sources of Norwegian legal authority that would help the court decide this issue.

**B. Aubert's motion for supervised visitation**

Aubert moves for supervised visitation with the children during the pendency of these proceedings. Specifically, he asks for video visits with the children while he remains in Norway, and for in-person visits once he arrives in Wisconsin for the evidentiary hearing. The relevant legal standard is not in dispute. The court may order temporary visitation under 22 U.S.C. § 9004 as a provisional remedy "to protect the well-being of the child." *See also Ly v. Heu*, 296 F. Supp. 2d 1009, 1011 (D. Minn. 2003) (visitation allowed as a provisional remedy under § 9004); *Castang v. Kim*, No. 1:22-cv-05136, 2023 WL 2401914 (N.D. Ga. Jan. 27, 2023) (same). The court looks to state law in determining whether to order provisional remedies. In this case, the relevant law is Wisconsin's custody and placement statute, Wis. Stat. § 767.41. The statute directs courts to consider "all facts relevant to the best interests of the child" in determining placement, including the wishes of the parents and children, the relationship the children have with both parents, and any history of interspousal battery or domestic abuse. *Id.* § 767.41(5)(am).

Aubert says that visitation would be in the children's best interest because it would facilitate the children's reintroduction to their father and make the transition easier if the court orders the children's return to Norway. Aubert retained a clinical psychologist to assist with facilitating video visits and also offered to pay reasonable fees for Poast to select a local therapist to facilitate video and in-person visits. Aubert asserts that facilitation by a trained

6

therapist will help alleviate any mental or emotional challenges the children may experience during visits.

In response, Poast asserts that Aubert was abusive toward her and the children and that the children don't want to see him. As evidence, Poast provides therapy records for both children. In February 2024, the older child, LPA, told a psychologist in Norway that she had witnessed Aubert physically abuse Poast. Specifically, LPA said that she saw Aubert choke Poast after Poast got angry with LPA for smearing glitter on the couch. Dkt. 41-1, at 2–3. Another time, LPA said she was in the bath, heard "shouting and a loud thump," and came out of the bath to see Poast on the floor crying. *Id.* LPA also described one instance in which Aubert physically hurt her, saying that he pinched her in the side while helping her with her math homework. *Id.* at 3. When asked how she would respond if someone like a judge decided she should see her father, LPA said that she doesn't want to see him and "just wants to run away." *Id.* As for APA, therapy records from February 2025 note that APA "[h]as experienced trauma and abuse from father" and "[h]as witnessed domestic violence," although the records do not describe any specific instances of abuse.

On reply, Aubert denies the allegations of domestic abuse. To support his version of events, he provides Child Protective Services (CPS) records from 2020 and 2023, police records from 2023, and a psychologist's observations of supervised visits between Aubert and the children in 2024. The 2020 CPS records provide another version of the choking incident that LPA allegedly witnessed. Officials at LPA's school reported the family to CPS after LPA told an adult at school that "daddy will strangle mommy if she gets mad at me." Dkt. 45-5, at 4. When CPS officials interviewed LPA, she said that her dad had recently choked her mom after her mom got angry at LPA for smearing glitter on the couch. But unlike in 2024, LPA denied

7

witnessing the choking in 2020. The CPS official wrote: "Ask her if she saw it. She says no, but mum told her." *Id.*

The 2023 CPS investigation was initiated after Poast reported Aubert for domestic violence. Dkt. 45-1 and Dkt. 45-2. CPS staff interviewed Poast, Aubert, and LPA, and obtained information from doctors, the police, and the children's school. Poast described Aubert as "dangerous," "violent," and "controlling" and said that she cut off contact with him to protect the children. Dkt. 45-1, at 6. Aubert "acknowledge[d] that on one occasion he . . . pinched [LPA] after she punched his nose but clearly state[d] that he has otherwise not been violent with the children." *Id.* Aubert said that there had "been some incidents" with Poast, but the CPS records did not describe these in detail. LPA described Aubert as a "threat" and "controlling," but also said that she loved him and trusted him. *Id.* at 5–6. CPS officials concluded that there was no evidence that Aubert was dangerous to the children. *Id.* at 8. They also concluded that Poast was "not shielding the children appropriately" from her own conflicts with Aubert, noting that some of the negative views LPA expressed about Aubert may have been influenced by what LPA had heard Poast say about him. *Id.* CPS officials said that "it is important that [LPA] gets to validate the positive feelings she has towards her father, and that she herself should be able to express this to him through contact." *Id.* at 8–9.

The police investigation was initiated in April 2023 after Poast reported Aubert for domestic violence. Dkt. 45-3 and Dkt. 45-4. The case was dismissed in April 2024 for insufficient evidence. Dkt. 45-3. In a memorandum, the prosecutor's office explained that there was little evidence to support the allegations beyond Poast's statements, which was not enough to meet the high evidentiary standard for criminal liability. Dkt. 45-4.

8

The psychologist's observations of the supervised visits between Aubert and the children in 2024 were generally positive. Dkt. 45-7. The psychologist observed positive communication between Aubert and the children during both visits. He noted that APA was "cheerful, trusting and approachable" with Aubert at all times, and that LPA was more reserved in the presence of Poast but that she appeared to relax once Poast left. *Id.*

The court concludes that it is in the children's best interest for Aubert to have visitation during the pendency of this case. Aubert had visitation rights when the children were removed from Norway, so an order granting visitation would reestablish the pre-removal status quo. The psychologist's observations from the pre-removal visits suggest that the children enjoyed and benefited from visiting with Aubert. Dkt. 45-7. It also appears that the children may have developed negative feelings toward Aubert in part because of how Poast has spoken about him. Visitation will allow the children to reconnect with Aubert and develop their own independent views of him. *See* Wis. Stat. § 767.41(5)4 (interference by one parent with the other parent's relationship with the child is a factor in determining placement).

Poast argues that Aubert has engaged in a pattern of domestic abuse, which requires the court to make her and the children's safety the most important factor in determining visitation. Wis. Stat. § 767.41(5)(bm); *see also Valadez v. Valadez*, 2022 WI App 2, ¶¶ 25–26, 400 Wis. 2d 523, 969 N.W.2d 770. Section 5(bm) doesn't apply here because Poast has not established by a preponderance of the evidence that Aubert engaged in a pattern of domestic abuse. *See* Wis. Stat. § 767.41(2)(d). And in any event, the visitation plan proposed by Aubert adequately protects the children's safety because Aubert agreed to have a trained psychologist supervise both the video and in-person visits.

9

Poast argues that in-person visits should be denied because they will interfere with Poast's ability to prepare for the evidentiary hearing. But any disruption will likely be minimal and is outweighed by the benefits to the children of reestablishing contact with their father.

The court will order weekly video visits of up to one hour between now and May 8, 2025, and two in-person visits of up to two hours between May 8 and May 14, 2025. Aubert has agreed to pay for supervision for these visits. The parties should confer regarding the schedule and supervision plan for these visits and submit a joint proposed visitation plan by April 14, 2025. The proposed plan should include visits beginning the week of April 14 unless both parties agree to an alternative plan.

## ORDER

IT IS ORDERED that:

1. Respondent Laurie Poast's motion to dismiss, Dkt. 29, is DENIED.

2. Petitioner Yves Aubert's motion for video and in-person visitation during the pendency of the case, Dkt. 35, is GRANTED.

3. The parties should confer and submit a joint proposed plan for supervised video and in-person visits by April 14, 2025.

Entered April 9, 2025.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge