IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

YVES AUBERT,

                Petitioner,

v.

LAURIE LEE POAST,

                Respondent.

OPINION and ORDER

24-cv-926-jdp

---

    Petitioner Yves Aubert petitions under the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act (ICARA) for the return of his two minor children to Norway. The children, whom the court will refer to as LPA and APA, are twelve and seven years old respectively. The children's mother, respondent Laurie Lee Poast, brought them from Norway to Wisconsin in May 2024 for a family visit and now refuses to return them to Norway.

    The court will deny Aubert's petition to return LPA and APA to Norway. The court concludes that Aubert lacked rights of custody to APA when she was removed from Norway, so he has not established a prima facie case for her return. Aubert has established a prima facie case for LPA's return. But the court concludes that separating LPA and APA presents a grave risk of psychological harm to both children, so the court will decline to return LPA either.

BACKGROUND

    This case was tried to the court during a two-day evidentiary hearing in May 2025. Many of the facts, particularly the parties' allegations of domestic abuse against each other, are disputed. But the general contours of the story are undisputed. The court therefore begins with

a brief background of the undisputed facts. The court will set forth any findings of fact regarding the disputed issues as they become relevant to the analysis.

Yves Aubert and Laurie Lee Poast met in 2008 or 2009 in Madison, Wisconsin, where Aubert was attending graduate school. Aubert is originally from Switzerland; Poast is from Wisconsin. They began dating and in 2009, they moved together to the Netherlands, where Aubert completed his PhD in neuropharmacology.

In 2012, the parties moved to Bergen, Norway, where their older daughter, LPA, was born in 2013. The parties lived together when LPA was born, but in 2015, Aubert moved into his own apartment. Although they no longer lived together, Aubert and Poast continued their romantic relationship. Their second daughter, APA, was born in 2018.

Both Aubert and Poast were involved in their daughters' day-to-day lives. LPA and APA lived at the family home in Bergen with Poast. Aubert did not live at the family home, but he spent most of his time there. Aubert, Poast, and the children went on vacations together and spent significant time together as a family of four.

The parties had a rocky relationship for many years, and each accuses the other of domestic violence. Norwegian Child Services became involved with the family on three instances: in January 2018, December 2019, and March 2023, each time because Poast complained to authorities that Aubert had been violent. Norwegian authorities never formally determined that Aubert had been violent toward either Poast or the children.

In March 2023, the parties had a fight in front of the children. The details are disputed and both sides accuse each other of verbal and physical abuse. After this incident, Poast refused to allow Aubert to see LPA and APA; she also initiated child services and police investigations against him. (Both investigations were eventually closed for insufficient evidence.) Aubert

2

requested mediation through the Bergen family office, which Poast did not attend. Aubert then sought contact with the children by initiating a case in family court. In February 2024, the parties reached a temporary agreement for three supervised visits between Aubert and the children; the first two visits were held on March 5 and April 23, 2024. A therapist assigned to supervise the visits observed positive interactions between Aubert and the children.

In May 2024, Poast asked Aubert's permission to take the children to Wisconsin to attend her father's funeral. Aubert consented, and the family obtained emergency United States passports to make the trip. (Poast, LPA, and APA are all United States citizens. They are not citizens of Norway.) On May 20, they went to the airport for their return flight to Norway, but were denied entry because of an issue with the emergency passports. Poast initially told Aubert that they were seeking new passports. But by July, she had decided to stay in Wisconsin with the children permanently.

When Aubert discovered that Poast did not intend to return the children to Norway, he sought relief through the Norwegian family court, but the family court decided that it could not rule while the children were in the United States. Aubert subsequently filed this petition under the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act (ICARA), seeking the return of LPA and APA to Norway.

## ANALYSIS

The Hague Convention on the Civil Aspects of International Child Abduction is an international anti-abduction treaty, which require signatories to return children to their country of habitual residence when they are "wrongfully removed to or retained in" another

3

country. *Redmond v. Redmond*, 724 F.3d 729, 731, 739 (7th Cir.2013); *see also* ICARA, 22 U.S.C. § 9001–9011 (implementing the treaty and granting enforcement authority to federal and state courts). A Hague Convention case "is not a child custody dispute." *Baz v. Patterson*, 100 F.4th 854, 865 (7th Cir. 2024) (quoting *Redmond*, 724 F.3d at 737). The court's role is not to resolve the custody issues between the parties, but only to determine which country is the proper forum to resolve those issues. *Id.* The core premise of the Hague Convention is that "the interests of children . . . are best served when custody decisions are made in the child's country of habitual residence." *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) (quoting Convention preamble) (cleaned up).

The petitioner in a Hague Convention case bears the burden of establishing a prima facie case for return. *Hernandez v. Cardoso*, 844 F.3d 692, 694 (7th Cir. 2016); *see also* 22 U.S.C. § 9003(e)(1). If he does so, then the burden shifts to the respondent to establish that one of the exceptions to return apply. 22 U.S.C. § 9003(e)(2). If the petitioner establishes his prima facie case and no exceptions to removal apply, then the return remedy is mandatory. Hague Convention, art. XII. ("Where a child has been wrongfully removed or retained . . . the authority concerned *shall* order the return of the child forthwith.") (emphasis added).

### A. Aubert's prima facie case

A prima facie case for return has five elements, which Aubert must establish by a preponderance of the evidence:

1. The child is under the age of 16.
2. The child was removed or retained;
3. The child was removed from her country of habitual residence;
4. The removal or retention was in violation of rights of custody held by the petitioner in the country of habitual residence.

4

5. The petitioner was exercising rights of custody at the time of removal. *Hernandez v. Cardoso*, 844 F.3d 692, 694 (7th Cir. 2016); *see also* 22 U.S.C. § 9003(e)(1) (burdens of proof). The parties agree that LPA and APA are both under the age of 16, that they were removed or retained, and that Norway is their country of habitual residence. But Poast contends that Aubert was not exercising rights of custody over either child at the time of their removal. The issues are different for each child, so the court will consider them separately.

### 1. APA

The Convention defines "rights of custody" to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention art. V(a). Rights of custody are distinct from rights of access, which do not allow a parent to petition for return. *Abbott v. Abbott*, 560 U.S. 1, 9 (2010). Visitation is a right of access, so a parent with only visitation rights may not petition for a child's return. *Id.*

Whether Aubert had rights of custody over APA is a question requiring interpretation of foreign law. The court resolves issues of foreign law in a Hague Convention case like any other question of law, but the court may consider "any relevant material or source, including testimony" in resolving the issue. *Garcia v. Pinelo*, 808 F.3d 1158, 1163 (7th Cir. 2015) (quoting Federal Rule of Civil Procedure 44.1). In this case, the parties submitted briefing on the Norwegian law issue and filed stipulated translations of the relevant case law. Dkt. 90, Exhibits 1–5.[1] The court also heard testimony at the evidentiary hearing from Halvor Frihagen, a Norwegian attorney specializing in family and immigration law.

---

[1] These cases are available on Norwegian government websites and legal research databases only in Norwegian. Therefore, the court will refer to the stipulated English translations on the docket when citing these cases.

The parties agree that the relevant law for determining the parties' custody rights is Norway's Children Act. *Act Relating to Children and Parents (Children Act), available at* https://www.regjeringen.no/en/dokumenter/the-children-act/id448389/. In Norway, the legal authority to make decisions on a child's behalf is called "parental responsibility." *Id.* ¶ 30. Parents can have joint parental responsibility, or one parent can have sole parental responsibility. *Id.*

Aubert concedes that Poast had sole parental responsibility for APA. When APA was born, the Children Act provided that mothers were granted sole parental responsibility if the parents were not married or living together. Children Act, § 35 (2008). Poast contends that because she had sole parental responsibility, Aubert had no right to determine APA's place of residence. She argues that section 40 of the Children Act is dispositive on this point; the first paragraph of that section states that "[i]f one of the parents has sole parental responsibility, the other parent may not object to the child relocating abroad."

Aubert counters that even though he lacked parental responsibility for APA, the Children Act gave him a *ne exeat* right over her. A *ne exeat* right— the right to prevent the child's removal abroad—is a custody right under the Convention. *Abbott*, 560 U.S. at 11. Aubert relies primarily on § 42a of the Children Act, which provides:

> If one of the parents intends to relocate within Norway or abroad, and access has been determined by agreement or decision, the parent who intends to move shall notify the other parent no later than three months prior to relocation. If the parents disagree regarding relocation, the parent who intends to relocate with the child must request mediation pursuant to section 51.

Aubert argues that § 42a is intended to give parents with visitation rights but no parental responsibility an opportunity to formally object to the child's relocation in mediation or in

6

family court. Once a parent makes a formal objection, then the Children Act provides that the child may not be relocated until the matter is resolved. *Id.* § 40, ¶ 3.

To support his contention that the Children Act confers a *ne exeat* right, Aubert points to a Norwegian Supreme Court case, Rt-2011-1564.[2] Dkt. 90-1. The facts of that case are similar to this case. The mother had sole parental responsibility for the parties' child; the father had visitation, but no parental responsibility. When the child was approximately six years old, the mother moved with the child to Australia, breaching the requirement under §42a of the Children Act that she notify the father before doing so. The Supreme Court took the case to decide whether the breach of the notification requirement meant that the child was still a resident of Norway, which would mean the Norwegian court had jurisdiction to decide the case. The court held that the child was still a resident of Norway and thus, that the court had jurisdiction. *Id.* ¶ 40.

To decide the jurisdictional question, the court in Rt-2011-1564 analyzed the legislative history of the notification requirement in the Children Act, arising from the same section Aubert says is the basis of his *ne exeat* right. Children Act § 42a. Relying on legislative history, the court reasoned that "the purpose of the [notification requirement] is to give the person entitled to contact the child the opportunity to influence the decision, for example by filing a claim to have parental responsibility transferred to them. If the parents disagree, the child cannot move out of the country until the case has been decided." Dkt. 90-1, ¶¶ 34–35 (citing *Act Concerning Children and Parents*, Norwegian Public Report (NOU) 1977:35, at 79). Aubert

---

[2] Norwegian cases involving minors use a naming convention in which letters in alphabetical order are substituted for the names of the parties. Thus, all the cases the parties cite in their briefs are named *A v. B.* For the sake of clarity, the court will refer to Norwegian cases by their citations rather than the parties' names.

7

argues that the notification requirement confers a *ne exeat* right because it gives him an opportunity to request mediation or initiate a custody case opposing the removal before it occurs. He says that if he had been given the opportunity to formally object, then he could have prevented APA's removal, because § 40, ¶ 3 of the Children Act bars removal when there is a formal dispute between the parties regarding a child's relocation.

Rt-2011-1564 supports Aubert's position that the purpose of the notification requirement is to give parents with visitation rights an opportunity to contest a child's removal before it occurs. But it doesn't follow that the notification requirement is a *ne exeat* right of custody under the Hague Convention. A wrongful removal determination under the Hague Convention is based on rights of custody as they exist at the time of removal. *White v. White*, 718 F.3d 300, 306–07 (4th Cir. 2013); *see also Garcia*, 808 F.3d at 1163. Aubert did not have parental responsibility when APA was removed, so under the plain language of the Children Act, he could not prevent it. Children Act, § 40, ¶ 1 ("If one of the parents has sole parental responsibility, the other parent may not object to the child relocating abroad."). Aubert contends that if he had been notified, he would have initiated a custody case and acquired the right to prevent the removal. But that doesn't change the reality that Aubert did not have the right to prevent APA's removal when it occurred.

The second portion of the court's decision in Rt-2011-1564 further supports the conclusion that APA's removal was not wrongful. After deciding that it had jurisdiction, the Norwegian Supreme Court affirmed the district court's decision to deny the father interim parental responsibility, quoting the district court's decision in relevant part as follows:

> Moreover, the court cannot see that the father, by sharing parental responsibility now, will be able to avert an irreparable situation, as he claims. *The mother's departure with the child prior to the proceedings was legal. She had sole parental responsibility, and there*

8

> *was no dispute between the parties at that time.* The court's decision with regard to residence pursuant to section 82 of the Children Act has the sole effect that the case may be heard by a Norwegian court.

Dkt. 90-1, ¶ 44 (emphasis added). Here too, Poast's departure with APA was legal because she had sole parental responsibility. She may have violated the law by failing to notify Aubert about the pending departure, but that doesn't call into question the legality of the removal itself. If the removal was legal under Norwegian law, then it was not wrongful under the Hague Convention. *See* Hague Convention Art. III.

In sum, Aubert has failed to establish that Poast wrongfully removed APA in breach of a right of custody he held under Norwegian law. His petition for APA's return must be denied.

2. **LPA**

Unlike with APA, Aubert held joint parental responsibility for LPA, which the parties agree is a right of custody under the Hague Convention. But in her trial brief, Poast contends that Aubert's prima facie case for return nevertheless fails because Aubert was not exercising his rights of custody at the time of LPA's removal. Poast points out that Aubert had not lived in the family home with the children for many years and had not had contact with them since March 2023, except for two supervised visits.

Poast's arguments that Aubert was not exercising his custody rights over LPA are brief and unpersuasive. "The standard for finding that a parent was exercising his custody rights is a liberal one, and courts will generally find exercise whenever 'a parent with de jure custody rights keeps, or seeks to keep, any sort of regular contact with his or her child.'" *Walker v. Walker*, 701 F.3d 1110, 1121 (7th Cir. 2012) (quoting *Bader v. Kramer*, 484 F.3d 666, 671 (4th Cir. 2007)). In other words, courts will find failure to exercise custody rights only when the petitioner has committed "acts that constitute clear and unequivocal abandonment of the

9

child." *Id.* (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996)). Here, Poast has prevented Aubert from seeing LPA since March 2023, but there is no indication that Aubert has abandoned his children. On the contrary, at the time LPA was removed, Aubert was seeking more contact with the children through the family court and was attending and actively participating in supervised visits. The court concludes that Aubert was exercising his custody rights at the time of LPA's removal and that her removal was therefore wrongful. Aubert has established his prima facie case for LPA's return.

### B. Exceptions to return

When a petitioner establishes his prima facie case, the return remedy is mandatory unless the respondent shows that one of the affirmative defenses applies. Hague Convention, art. XII. Poast raises four defenses in opposition to LPA's return:

1. Return would expose LPA to a grave risk of physical or psychological harm.
2. LPA objects and is sufficiently mature for the court to consider her views.
3. Aubert acquiesced to the removal.
4. Return would violate fundamental principles relating to the protection of human rights and fundamental freedoms.

*Id.* art. XIII, XX.

The court is not persuaded by Poast's second, third, and fourth defenses. Whether a child is sufficiently mature is a fact-intensive inquiry, which requires the court to consider the reasons the child gives for objecting to return, whether those reasons are generalized or specific, whether they reflect an adult understanding of the situation, and any undue influence the removing parent may have had on the child's preferences. *Tsai–Yi Yang v. Fu–Chiang Tsui*, 499 F.3d 259, 279 (3d Cir.2007); *Garcia*, 808 F.3d at 1167-68; *Walker*, 701 F.3d at 1123. After interviewing LPA, Aubert's child development expert Peter Favaro concluded that LPA's

reasons for not wanting to return to Norway were not rooted in a mature understanding of the situation. Dkt. 59-4, at 36–37, 44 (noting that LPA's first objection was that she did not like the weather in Norway). He also said that LPA was likely influenced by her loyalty to her mother and the lack of recent contact with her father. *Id.* at 36–37; 44–46. Favaro's opinions align with the court's own perceptions when it interviewed LPA in chambers. The court finds that LPA is not sufficiently mature for the court to consider her objection.

Poast spends little time on her third and fourth defenses in her brief and her arguments in support of these defenses are exceptionally weak. She says that Aubert acquiesced to the children's removal because he "knew that neither LPA nor APA held Norwegian citizenship with rights to re-enter that country, but nevertheless consented to their departure." Dkt. 59, at 28. But the record shows that Aubert took steps to assist Poast in acquiring new passports after the children were prevented from boarding their return flight to Norway, demonstrating that he did not acquiesce to their staying in the United States. As for Poast's article 20 defense on the grounds of "human rights and fundamental freedoms," Poast argues that it would violate constitutional principles to remove LPA because she is a United States citizen. The article 20 exception addresses the "rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process." *Sabogal v. Velarde*, 106 F. Supp. 3d 689 (D. Md. 2015) (citing *Hague International Child Abduction Convention; Text and Legal Analysis,* U.S. Department of State, 51 Fed.Reg. at 10,510). To the court's knowledge, no American court has ever applied this exception in a Hague Convention case, and there is no reason to do so here.

That leaves the grave risk exception. In considering this exception, the court finds it dispositive that ordering LPA's return might require her to be separated from APA. The Hague

11

Convention treaty provides no guidance on how courts should handle the situation where one sibling was wrongfully removed but another was not. But courts faced with this situation have routinely declined to separate siblings on the basis that separation would cause psychological harm. *See, e.g., Ermini v. Vittori,* No. 12 CIV. 6100 LTS, 2013 WL 1703590 (S.D.N.Y. Apr. 19, 2013), *aff'd*, 758 F.3d 153 (2d Cir. 2014); *Leonard v. Lentz*, 297 F. Supp. 3d 874, 897 (N.D. Iowa 2017); *Miltiadous v. Tetervak*, 686 F. Supp. 2d 544 (E.D. Pa. 2010); *but see Whallon v. Lynn*, 230 F.3d 450 (1st Cir. 2000) (considering the sibling relationship "would undercut the Convention's presumption of return . . . in situations where that child had a sibling who was not wrongfully removed").

The parties and the court agree that LPA and APA have a close sibling relationship and that separating them would cause psychological harm to both children. Neither party wants the children to be separated. At the evidentiary hearing, Aubert said that if the court decided that only LPA had been wrongfully removed, he would not insist on her return if it meant she had to be separated from APA. In light of the parties' agreement on this issue, the court finds that separating the children would cause a grave risk of psychological harm to LPA and to APA. Aubert's petition for return will be denied. The parties' custody dispute may be heard in the courts of Dane County, Wisconsin.

The court's decision to apply the grave risk exception is based solely on the harm arising from separating the children, which is enough to resolve this case. The court declines to make any findings of fact regarding the disputed allegations of domestic abuse between Poast and Aubert, other than to say that Poast did not establish by clear and convincing evidence that there was a grave risk that Aubert would be physically violent or emotionally abusive toward the children.

ORDER

IT IS ORDERED that petitioner Yves Aubert's petition for return of his two minor children to Norway under the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act is DENIED. The clerk of court is directed to enter judgment and close this case.

Entered September 18, 2025.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge